UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                    Bankruptcy No. 13-30607
                                                          Chapter 11
J&J Oilfield Services, Inc.

                    Debtor.
_____/

### MEMORANDUM AND ORDER

This matter is before the Court to consider confirmation of Debtor's Modified (May 19, 2015) Amended Plan of Reorganization (#4) filed May 19, 2015 (the Plan). Doc. 324. Interstate Power Systems, Inc. and the Unsecured Creditors Committee filed a pleading advising the Court that they did not object to the Plan or the treatment of the class of unsecured creditors in it, and they requested that the Plan be confirmed. See Doc. 332. Secured creditor Union State Bank of Fargo is the only party that objected to the Plan.

The Court has jurisdiction over this matter under 11 U.S.C. § 157(b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L), and the Court finds that it has authority to enter a final judgment in this case.

The Court held a hearing to consider confirmation of the Plan on May 27, 2015. During this hearing, the Court advised the parties that it would consider the evidence received during the hearings on March 4, 2015, March 10, 2015, May 14, 2015 and May 27, 2015, in its decision regarding confirmation of the Plan. After reviewing the history of hearings in this case with counsel, the Court received no objections or additions to the scope of evidence it agreed to

1

consider.  For the reasons that follow, Union State Bank's objections based on good faith and unfair discrimination are overruled; its objection based on feasibility of the Plan is sustained.  Confirmation of the Plan is denied.

## I.  Background

Debtor is a North Dakota corporation in the business of general civil construction and oilfield services, including gravel crushing, dirt and aggregate excavation and placement, dirt and aggregate hauling and general oilfield services.  Debtor was incorporated and began business in 2009.  Joseph Ottesen is the sole shareholder of Debtor.  Debtor's only capital resources available to generate income are its equipment and real property.

Debtor encountered a number of financial difficulties that ultimately led to its petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code on September 13, 2013.  According to Debtor's Amended Disclosure Statement (DS #4), the significant events that led to Debtor's decision to petition for bankruptcy relief include:

1.      A dispute with Hess Corporation in which Debtor rented construction mats in 2011.  The contract with Hess totaled approximately $4,500,000; Debtor claims it is still owed over $800,000.  Debtor has an additional claim against Hess for $212,335 plus interest for the period of February 2011 through March 2012.  While acknowledging that it owes $91,000 to Debtor, Hess refused to pay any part of the claim unless Debtor waives all other claims against Hess.  This dispute was not resolved at the time of the confirmation hearing.  There was no

2

evidence of an ongoing business relationship between Debtor and Hess since Debtor filed its bankruptcy petition.

2.    Debtor invested $311,000 in Rising Sun Construction in May 2012, which is now defunct.

3.    Due to wet weather conditions in early 2013, Debtor was not able to start gravel crushing production until May.

4.    Disputes with Quality Aggregate, LLC and Tioga Ready Mix.   These disputes are still pending.

5.    Debtor purchased M and M Aggregate in 2012 and assumed a contract with Master Construction as part of the purchase.   Debtor estimates that it lost $800,000 as a result of work it assumed under the contract.   Debtor owes a debt of over $453,000 to Interstate Power Systems, Inc. as a result of the project.

6.    Debtor claims disputes with Union State Bank, including the state court-sanctioned replevin of its equipment, delayed its operations.

Some of the challenges that led to Debtor's bankruptcy continue to plague Debtor, hampering its ability to reorganize.  Although Debtor has not invested in any new business ventures, litigation over contracts with Hess, Quality Aggregate, Tioga Ready Mix and other customers continues.  More importantly, Debtor continues to face challenges with collecting both prepetition and postpetition accounts receivable.

3

**A.      Prepetition Accounts Receivable**

On the date of petition, Debtor's accounts receivable totaled $2,194,636.60.  Its prepetition accounts receivable as of April 30, 2015, totaled $1,884,259.59.   Therefore, Debtor collected only $310,377.01.   Based on evidence presented to the Court, it estimated that only $105,463 of the outstanding prepetition accounts receivable is collectable.

**B.      Postpetition Accounts Receivable**

As of April 30, 2015, the balance of Debtor's postpetition accounts receivable was:

> under 30 days - $338,234.02
> 30-60 days - $28,259.90
> 61-90 days - $357,892.92
> 91-120 days - $446,891.94
> Over 120 - $0

Total postpetition accounts receivable = $1,171,278.78

Due primarily to the fact that one customer, Oil & Gas Transfer, either refuses to pay or does not have the ability to pay Debtor, Debtor's accounts payable is aging as well.  It owes $137,697.51 that is 61–90 days overdue and $281,297.96 that is over 91 days overdue.

**C.      Debtor's Work History**

Since Debtor petitioned for relief, the services Debtor provided to its customers evolved from dirt work, trucking and rock crushing to serving as a general contractor for any number of services including pipeline construction, repair and maintenance services and "emergency cleanup" services.

4

From 2012 through August 2014, Debtor did not operate at full capacity. During the 2014 calendar year, its operations were limited primarily to trucking, equipment rental, crushing/stockpiling material and dirt work. According to the 2014 Projections Debtor included in its August 2014 Disclosure Statement, Debtor planned to generate revenues through trucking, dirt work, rock crushing and equipment sales.

In the nearly two years since it filed its petition, Debtor has performed comparatively little rock crushing. Debtor continues to provide a considerable amount of trucking services, but many of the contracts on which it has recently focused its resources relate to general oilfield services and pipeline construction, repair and maintenance. Debtor has searched for work in line with its expertise and resources, but has also been responsive to contractors who wish to procure services for which Debtor is not equipped, requiring that Debtor subcontract for materials and equipment. These services include "emergency cleanup" services, portable toilet rental, hydrotesting, septic line service work, light plant rental and supplying storage tanks for potable water.

For example, Debtor contracted with Oil & Gas Transfer to hydrotest an oil pipeline and perform some cleanup work. Unfortunately, Debtor encountered multiple problems with the project. Oil & Gas Transfer owes Debtor in excess of $598,000 for the work Debtor performed, and it appears that litigation is necessary to collect this sum.

5

In late 2014 and early 2015, Debtor also performed services for:

1. Enable Midstream Partners, LP. Debtor's services included hydrotesting and tank cleaning. Debtor may receive more pipeline maintenance work, but there were no contracts in place for future work at the time of the confirmation hearings.

2. Enable Bakken Crude Services. Debtor's services included equipment rental, light plant rentals and renting portable toilets.

3. Utility Services of America. Debtor's services included supplying aggregate, providing and hauling gravel and sand and filling in the dirt upon completion.

4. Petrogulf. Debtor performed more than $150,000 of trucking work for this company, including trucking and outhouse rental. Debtor has a Master Service Agreement with Petrogulf, but it has not awarded any contracts or requested work recently.

5. Burke County. Debtor performed rock crushing and stockpiling in December 2014 and January 2015.

6. Kandiyohi Township. Debtor performed rock crushing and/or hauling material.

7. Debtor also performed work such as pipeline thawing and maintenance for several other customers which resulted in invoices of less than $10,000 each. These contractors have paid their invoices.

D.    **Future Work**

During the March and May 2015 hearings, Debtor offered evidence that its bid was among those selected to perform gravel crushing work for Burke County, North Dakota.  The County has not submitted an order since accepting Debtor's bid.

Joseph Ottesen testified at the March 4, 2015, hearing that Debtor was also the apparent low bidder for gravel hauling in Mountrail County, North Dakota.  Ottesen testified that this contract could exceed $4 million, and that Debtor would begin this work in April 2015.  As of the May 27, 2015 hearing, Mountrail Country had not contacted Debtor to do this work, but Ottesen still maintained that he expects to be called for this work although he was not sure when.

Likewise, Debtor submitted bids for work in the City of Ray, North Dakota for delivery of material and the City of Williston, North Dakota for hauling and disposing concrete.  Debtor has not received a purchase order or work request for these projects.  Ottesen also testified that Debtor's bid was accepted for gravel crushing in Divide County, North Dakota.  Debtor will be on call for this work, and Ottesen does not know when it will begin.  Ottesen testified that Debtor will complete a field rock contract for Heartland Grading on a project near Tioga, North Dakota.  As of May 2015, Debtor had not completed this work.

Ottesen also stated that he has an ongoing relationship with Enable and expects new work from them, although he did not elaborate.  Ottesen expects

this business relationship to continue despite the fact that Debtor filed a mechanics lien against Enable's pipeline as a result of Oil & Gas Transfer's refusal to pay its $598,000 debt to Debtor.

Ottesen further testified that Debtor is working with NextEra Energy/Florida Power & Light.  Ottesen stated that NextEra hired Debtor as a service contractor to perform maintenance on an operating pipeline.  He testified that Debtor completed "a couple hundred thousand dollars of work in just the last two months."  NextEra has already paid Debtor approximately $122,000.  Ottesen stated that the night before the hearing, he received a phone call from NextEra, and they have "several other projects they wanted [him] to look at."

Ottesen testified that Debtor's business transitioned due to changing demand.  He explained that customers contact him, and he does his best to accommodate their needs.  He acknowledged that sometimes he does not have the right equipment and has to find subcontractors.  He also testified that qualified labor is difficult to find, but this situation is improving as workers leave the state and labor demand is changing.  Ottesen stated that with the downturn in the oil and gas economy beginning around December 2014, more employees became available for him to potentially hire.

In summary, Ottesen has worked very hard to pursue work for Debtor, but the opportunities in western North Dakota remain uncertain and qualified labor difficult to hire.

**E.      Profitability**

While Union State Bank's President, Mary Johnson, acknowledged that

Ottesen has demonstrated efforts to find and maintain work for Debtor, the Bank

argues that Debtor has not offered evidence sufficient to show that the work it

has performed and is planning to perform will be sufficiently profitable to ensure

that it will make its Plan payments.

Specifically, Union State Bank asserts that Debtor has not offered

historical data demonstrating that it can generate and collect funds sufficient to

make its Plan payments, and it has not yet implemented a job cost system that

will allow Debtor to understand the profitability of each contract at any stage of

work performance or to bill customers on an interim basis.  Ottesen

acknowledged that Debtor has not implemented a job cost system like the one

the Bank described.  Instead, Debtor maintains detailed job files showing the

profitability of each contract after the contract is complete.  For contract bids,

Ottesen estimates fuel, trucking expenses based on an hourly rate, labor,

insurance, material mark up and then adds a profit margin.  Based on this

analysis, Ottesen submits bids on behalf of Debtor.  Ottesen thinks Debtor

typically realizes a 30% profit margin.

In May 2015, Debtor hired Todd Teiken as chief financial officer and

operations manager.  Teiken worked for 34 years as a special operations general

manager for Kmart and specialized in turning around unprofitable stores.  He is

working on improving Debtor's bidding processes, controlling costs and taking

over administration, accounting and billing.  Teiken's responsibilities also include

working to alleviate the pressure on Ottesen, allowing him to use his time more

effectively.

Ottesen testified that one of Teiken's responsibilities will be to implement a

more sophisticated job cost system.  Ottesen believes that Teiken will assist

Debtor in understanding the true profit margin at various stages of a contract so

that Debtor can increase or decrease profit margin as necessary to win future

contracts.

## F.   Projections

Beyond those contracts Ottesen is currently pursuing, Debtor's business is

uncertain.  Ottesen testified that he does not know what type of work will be

available or what work Debtor will perform after a couple of years.  Consequently,

Debtor prepared projections for 2014, 2015 and 2016 only.

Regarding the reliability of Debtor's projections, in its March 30, 2015

Disclosure Statement, Debtor represented that the projection statements

attached as Exhibit I are:

> JJ Ottesen's best estimates based upon the present demand for
> services, anticipated projects for this time period, equipment
> available and the hope he can obtain the necessary labor.
> Obviously, he can only provide a narrative as to present demand
> and the equipment he has.  The entire region (Bakken development)
> can change drastically and quickly, changing the demand for his
> services–he cannot predict that.  As to the necessary labor force,
> J&J is just like a lot of other employers in that area that advertise for
> employees, hire new employees but the new hires frequently move

on with little or no notice.  J&J does everything it can to retain its
best employees.

Doc. 286, at 16.

In its 2014 projections, Debtor estimated gross revenue of $2,389,419 for
2014, but its actual gross revenue was over $1 million less than this figure.  It
estimated operating cash flow of $721,982.29 for 2014, but its cash flow was only
$193,674, which is insufficient to make all Plan payments particularly when
$149,857.03 of this income was derived from prepetiton accounts receivable
which serves as security for debt to Union State Bank.

Debtor offered no historical data to support the proposition that it would
realize a net income of $478,224 in 2015 or $538,855 in 2016.  Other than
Otteson's efforts to generate work summarized above, Debtor offered no
evidence that it would achieve gross receipts of $3,760,000 in both 2015 and
2016.  The gross receipt figure is three times the figure Debtor earned in 2014,
and more than $1 million more than the gross revenue it earned in any one year
since it began business, except 2011.  The only historical data the Court received
as evidence was one page from a 2014 tax return and operating reports that
show Debtor realized a tax loss of $182,159.  If depreciation is not considered,
Debtor realized a profit of only $193,674 in 2014 (or $43,817.64 if prepetition
accounts receiveable are deducted).

In argument, Union State Bank lists Debtor's profits from 2009–2014
based on tax returns disclosed in discovery.  Union State Bank argues that

Debtor showed tax losses in 2012, 2013 and 2014 and has never shown a profit above $25,000, except in 2011 when it earned over $1.8 million.  Debtor does not dispute these figures, but evidence was not offered or received supporting it except for calendar year 2014.  Debtor's accountant, Brent Drovdal, conceded that Debtor suffered a net loss in 2012 and 2013, however.

Debtor's monthly reports and a summary exhibit received as Exhibit 53 show Debtor's cash flow as follows:

|                | Cash basis | Accrual basis |
|----------------|------------|---------------|
| February 2014  | -33,050    | 40,893        |
| March 2014     | 11,915     | -3,329        |
| April 2014     | -1,428     | 9,603         |
| May 2014       | 21,371     | -27,137       |
| June 2014      | -1,706     | 10,959        |
| July 2014      | 2,436      | -33,628       |
| August 2014    | 76,872     | 82,975        |
| September 2014 | 126,047    | 127,732       |
| October 2014   | 157,717    | 149,210       |
| November 2014  | -83,124    | -143,475      |
| December 2014  | -18,521    | 48,038        |
| January 2015   | 375,165    | 360,988       |
| February 2015  | -26,158    | 800           |
| March 2015     | -295,382   | -177,685      |
| April 2015     | 154,978    | 60,069        |

See Ex. 53.

12

These figures show that Debtor did not collect sufficient receipts to pay its debts 7 out of 15 months.  Although it is not entirely clear what Debtor's monthly Plan payments will be because this figure was not provided, it appears that Debtor would have to pay almost $21,000 on the effective date of the Plan, and monthly payments of more than $26,000.  These numbers do not include attorney fees of at least $120,000, accounting fees of at least $17,500, trustee fees and any payment to Joseph Ottesen.  In addition, Debtor would also have to pay a minimum of $50,000 to the unsecured creditors each year.  Based on these figures, Debtor would not have had sufficient cash flow to make Plan payments in 10 out of 15 months listed above if the Court looks each month, standing alone.  If the Court considers a running balance, in 6 out of 15 months Debtor would not have had sufficient cash flow to make Plan payments.

If the Court considers the income Debtor earned but has not yet collected, Debtor's financial status appears better.  Unfortunately, Oil & Gas Transfer refuses to pay the nearly $600,000 it owes Debtor, making Debtor's argument that the Court should rely on accrual-based figures unpersuasive.

Union State Bank also challenges the reliability of particular expense figures Debtor used to project income for 2015 and 2016. Specifically, the Bank suggests Debtor underestimated fuel, repairs and wage expenses because each expense was a significantly lower percentage of gross revenue than in the past. Union State Bank conceded, however, that its analysis of these numbers was skewed by information it did not consider or misinterpreted.  For example, Debtor

13

sold $144,000 of fuel to its customer in conjunction with one project but included the fuel as a fuel expense rather than as product resold.  This mischaracterization made it appear that Debtor has been using more fuel in its operation than it actually used.  Consequently, reliance on fuel as a percentage of income during this reporting period results in unreliable calculations.  Similarly, the Bank considered equipment repair cost figures from 2011, which was an anomaly given the $9 million in revenues generated and the large number of purchases and repairs made that year.

Debtor recognized that the Bank's objections to its fuel and material projections were caused, in part, by its poor record-keeping and miscategorization of expenses–challenges Debtor is continuing to address, but which still require more progress.

Other than Ottesen's testimony that he continues to work hard to obtain business, that companies who work in the oil fields can rely on his timely response and that he expects demand for Debtor's services will continue due to "surge funding" from the State of North Dakota, Debtor offered no evidence that Debtor would continue to receive work and show profitability sufficient to make the payments under the Plan.  Debtor offered no business plan, no expert testimony and no contracts showing guaranteed work in 2016 or after.  Even the work Debtor expects to receive in the next few months is uncertain.  Debtor's bids have been accepted by several North Dakota counties, but none of the work the counties anticipated they might need has resulted in actual work orders yet.

14

Debtor filed a lawsuit against Oil & Gas Transfer who owes it more than

$598,000 and filed a mechanic's lien against the pipeline owned by Enable, who

Debtor anticipated might provide more work in the future.  Although Debtor

expressed optimism, it is apparent to the Court that Debtor's business

relationship with both companies remains uncertain.

**G.    Balloon Payment**

In addition to the lack of evidence regarding cash flow projections and its

ability to make Plan payments, Debtor offered little evidence about its ability to

make the projected balloon payment which will be in excess of $500,000 in four

years.  When asked at the May 2015 hearing how he would make the balloon

payment, Joseph Ottesen testified that he planned either to use profits or to

refinance the remaining debt, but he did not explain how he would accomplish

either of these options. He testified he had no plan to put aside funds for a

balloon payment.

Debtor offered no cash flow projections beyond the first two years of the

Plan and no evidence supporting its ability to generate income sufficient to meet

all its expenses, make its Plan payment to other creditors and pay Union State

Bank the balance of its debt when the balloon payment becomes due.

Regarding Ottesen's statement that Debtor may seek to refinance its debt

to Union State Bank, Ottesen inferred that Debtor will be able to use its

equipment as collateral for a new loan.  Ottesen estimated that the equipment

will last beyond the four-year amortization of the Bank's debt.  He also claimed

that the market value of the equipment will not depreciate as much as it had before.  He guessed that the equipment will be worth more than $600,000 four years from now, suggesting that there would be equity in the equipment at the time the balloon payment was due sufficient to refinance the loan or borrow money from a different lender.

Union State Bank offered evidence inconsistent with Debtor's claim that it will be able to refinance its debt.  Johnson testified that she would want to see projections demonstrating that Debtor could indeed make the balloon payment provided in the Plan, but that history is a good indication it is unlikely.  The Bank does not extend loans without a payment source, and it would need to know the source of the funds for the balloon payment before it would agree to refinance the debt.  The Bank would also require strong historical performance and projections, guarantor strength, sufficient collateral value, and a quality of character in the lender – all of which Johnson testified are missing in this case. Johnson stated that for Debtor to qualify for refinancing of the balloon payment, Debtor would need three very strong years, and it is questionable whether it could even get through the first year of its Plan.  Johnson testified that the Bank would require a new appraisal of Debtor's equipment and an improved business plan.  Even then, Johnson maintained Union State Bank will not finance the balloon payment.

In response to Debtor's suggestion that its equipment could be used as collateral for refinancing its loan or obtaining a new loan, Union State Bank

16

repeatedly argued that the value of the equipment has decreased substantially

during the term of the Plan and maintained that there would not be sufficient

equity in the equipment to refinance the debt because the equipment is old and

Debtor has not set aside money to repair or replace it.  Based on the evidence

offered during hearings before this Court, it found that the value of Debtor's

equipment was approximately $1,886,000 in October 2013 and approximately

$1,369,000[1] in March 2015.  However, the Court declines to rely solely on these

figures to make any conclusions regarding the rate of depreciation.  Without

other evidence rebutting Ottesen's claim that Debtor's equipment will be worth

roughly $600,000, the Court must defer to this conclusion.

## H.    Other Problems

In addition to its concerns about Debtor's inability to produce reliable

projections demonstrating profitability, Union State Bank offered evidence of

other business deficiencies which it claims support its argument that confirmation

of the Plan should be denied.

Union State Bank offered evidence that Debtor's inability to maintain

accurate business records in accordance with appropriate accounting standards

resulted in tax problems and affected Debtor's profitability.

At the March and May hearings, the Court received evidence that Debtor

incurred a large prepetition tax debt because it failed to pay payroll taxes.  It also

received evidence that Debtor's accountant did not timely pay payroll taxes

---

[1] $1,429,000 – 60,000 (truck with a John Deere first lien) = $1,369,000.

postpetition, resulting in new penalties.  The evidence also shows, however, that
Debtor is actively seeking to reduce these penalties through offsets of personal
tax refunds and negotiations with the IRS.  The original proof of claim filed by the
IRS in January 2014 listed Debtor's outstanding obligation as $323,763.76; in
May 2015 the IRS filed a proof of claim that indicates $213,852.73 is due and
owing.  Given the reduction in tax owing throughout the past two years, it
appears Debtor realized some success with these efforts.  Debtor's accountant
also testified that he corrected the problem with tardy payments and Debtor is
complying with tax requirements.

In addition, Union State Bank contends that Debtor did not issue 1099s to
subcontractors as required by the IRS.  Specifically, the Bank questioned
Ottesen about three checks he wrote.  One check was made out to "David
Kistler," another to "Don Keller" and the other to "Kent Bjorge."  Ottesen testified
that the work corresponding to each of these checks was subcontracted to a
corporation or an LLC, despite the fact that the checks were made out to
individuals.  In the case of "Don Keller," Ottesen testified that he made the check
out to "Keller," which is the name of a corporation in Minot, North Dakota, and
that the word "Don" was not written by him and was not in his handwriting.
Ottesen testified that the check made out to "David Kistler" was for work
performed by a corporation, and that the check made out to "Kent Bjorge" was for
work completed by an LLC.  Debtor's accountant, Brent Drovdal, testified that
Debtor is not required to issue a 1099 to corporations or LLC subcontractors.

18

Union State Bank argued that the checks should have been written to the businesses as opposed to the individuals.  Ottesen testified that each of these checks was payment for work performed by a corporation or an LLC, and the Bank provided no evidence to the contrary.

In addition to tax problems resulting from inaccurate or incomplete accounting procedures, the Court received evidence that Debtor's monthly reports are often filed late and are inaccurate or incomplete.  Union State Bank claims it must often ask questions and seek clarification about items in the reports that are not self-evident, including numerous cash withdrawals.  Debtor does not have an adequate accounting system in place.  Debtor has no job cost system and thus cannot reliably predict whether a particular contract will be profitable.  Further, Debtor admitted to hiring four accountants in the past three years.

The Court also received evidence suggesting that Debtor paid multiple personal expenses of Joseph and Annemie Ottesen.  Union State Bank alleges that Debtor paid home insurance on the Ottesen's residence in West Fargo in the amounts of $1,480 and $3,052.  Ottesen admitted to paying the deposit on his home insurance with Debtor's funds, but offered testimony that Annemie and Linda Ottesen both perform work for Debtor from this residence.  Joseph and Annemie Ottesen each use a vehicle owned by Debtor.  Ottesen testified that he uses his vehicle solely for business purposes, because he rarely has time to himself that is not spent on his business.  Ottesen also testified that, while

Annemie drives a company vehicle, she pays for maintenance, fuel and tires.

The Bank alleges Debtor paid the electric bill for the Ottesen's residence in West

Fargo, that Debtor paid for personal clothing of the Ottesen's at Boot Barn and

J.C. Penney, and that Debtor paid medical expenses of the Ottesen's at CVS

Pharmacy and Sanford Health.  The Court received no testimony regarding the

electric bill.  Ottesen testified that the purchase made at Boot Barn was for fire

retardant clothing that he purchased for his employees and that the purchase

was not for personal clothing.  Ottesen further testified that the purchase made at

J.C. Penney was for a business suit he needed to attend a conference in Minot,

North Dakota.  Ottesen did not testify regarding the CVS Pharmacy purchase,

but he denied that the Sanford Health purchases were for personal medical

expenses.  Finally, Union State Bank argues that Debtor paid for personal

expenses of the Ottesens at multiple restaurants.  Ottesen did not testify about

restaurant expenses.

Union State Bank also complains about Debtor's multiple cash

withdrawals.  Ottesen testified that he provided documentation to the Bank for all

of these cash withdrawals, and the Bank presented no evidence to the contrary.

Union State Bank raised questions about whether handwritten receipts from

Debtor were sufficient to explain the cash withdrawals, and Mary Johnson

testified that cash withdrawals are evidence of poor business practices.

Debtor admitted converting approximately $44,000 of Union State Bank's cash collateral in November 2014 without the Bank's consent.  Debtor fully repaid the funds.

## I.  Relationship with Primary Lender

In addition to Debtor's challenges with recordkeeping and accounting practices, Debtor faced challenges with its relationship with its primary lender. Mary Johnson worked closely with Debtor when Union State Bank first learned Debtor was in financial trouble.  Ottesen met frequently with Johnson and they were often in contact, sometimes several times a day.  Eventually, Ottesen stopped communicating with Johnson.  He was not answering or returning phone calls, and he stopped meeting with Johnson.  Union State Bank had a difficult time obtaining accurate financial information from Debtor.  The financial statements Debtor provided to the Bank were very crude, showing only checks coming in and checks going out.  Ottesen repeatedly assured the Bank he had work "lined up," but these representations repeatedly failed to materialize or lead to revenue.  Until the Court-ordered cash collateral payments in March 2015, Debtor had not made a payment to Union State Bank since January or February 2013.  Further, Union State Bank repeatedly requested equipment maintenance records from Debtor, but Debtor never provided them.  Debtor's monthly reports are often filed late, despite repeated complaints from the Bank about timely filing. According to Johnson, Debtor's conversion of approximately $44,000 of Union

State Bank's cash collateral in November 2014 led to a complete breakdown of
the Bank's relationship with Debtor.

**J.    Progress in Improving Business Profile and Chances for Success**

While the evidence outlined above shows that Debtor faces many
challenges, the Court received a great deal of evidence regarding steps Debtor
has taken to improve its business, and the Court is quite impressed with the
progress Debtor made in the last year and a half.

Debtor had several violations with MSHA – including violations in June
2012 – that are now settled.  Based on an inspection last fall, Debtor is in
compliance with both OSHA and MSHA regulations.  Debtor is also current on its
premiums to Workforce Safety Insurance and received a 25% compliance
discount in 2014.  Debtor joined ISNetworld, an online resource for connecting
clients with contractors and grading contractors based on safety and compliance.
Most of Debtor's customers use ISNetworld and many of these customers only
work with other companies in the network.

Linda Ottesen testified that she puts together checklists to protect both
Debtor and its employees.  She ensures that employees are properly trained on
the equipment they are using.  She has begun a program that provides for
maintenance to be performed on a schedule and includes preventive
maintenance including daily inspections to give Debtor an insight into its needs.

The North Dakota chapter of the General Contractors Association awarded Debtor a safety award, and the State of North Dakota has licensed Debtor as a general contractor.

Lastly, as discussed above, Debtor hired Teiken to improve Debtor's business processes.

## II.  Discussion

Section 1129 of the Bankruptcy Code controls confirmation of Chapter 11 plans.  The Court may not confirm a plan unless all of the requirements of section 1129 are met.  "The plan proponent, Debtor[] in this case, bears the burden of establishing that the requirements of § 1129 are met by a preponderance of the evidence."  In re Bryant, 439 B.R. 724, 738 (Bankr. E.D. Ark. 2010) (citing Cutcliff v. Reuter (In re Reuter), 427 B.R. 727, 769 (Bankr. W.D. Mo. 2010)).

Union State Bank raises three objections to the Plan:  Debtor did not file the Plan in good faith; the Plan unfairly discriminates against Union State Bank; and the Plan is not feasible.  The Court will address these objections in turn.

## A.    Good Faith

The Bankruptcy Code requires that a Chapter 11 "plan has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). "In essence, the good faith inquiry looks at the debtor's fairness in dealing with creditors."  Barger v. Hayes Cnty. Non-stock Co-op (In re Barger), 233 B.R. 80, 83 (B.A.P. 8th Cir. 1999).  "[F]or purposes of determining good faith under section 1129(a)(3), as well as section 1325(a)(3), the important point of inquiry is

23

the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Reuter, 427 B.R. at 770. "According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The proper inquiry is whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code." Id. "The Court must focus on factors such as whether the debtor has stated debts and expenses accurately; whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether the debtor has unfairly manipulated the Bankruptcy Code." In re Barger, 233 B.R. at 83 (citing Noreen v. Slattengren, 974 F.2d 75, 76 (8th Cir. 1992); Handeen v. LeMaire (In re LeMaire), 898 F.2d 1346, 1349 (8th Cir. 1990)). "In the context of a chapter 11 reorganization . . . a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Id. (quoting Hanson v. First Bank of South Dakota, 828 F.2d 1310, 1315 (8th Cir. 1987)). Finally, the "court should consider whether the plan has been proposed with the legitimate and honest objective of preserving the Debtor's business while maximizing the return available to creditors." Id. at 83–84 (citing In re Trans World Airlines, Inc. 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995)).

Union State Bank argues that Debtor's Plan was not filed in good faith because Debtor abused the bankruptcy process, ignored the bankruptcy code,

allowed itself to incur penalties and fines as a result of its poor business and

accounting practices, paid personal expenses of Joseph and Annemie Ottesen,

and used Union State Bank's cash collateral without consent.  The Bank also

argues that multiple cash withdrawals from Debtor's bank account demonstrate

bad faith.

The Court will address these arguments in turn:

1.    Tax issues and failure to issue 1099s

Union State Bank complains that Debtor allowed itself to incur fines and

penalties as a result of its poor business and accounting practices.  It reminded

the Court that Debtor incurred prepetition tax penalties as a result of failure to

pay payroll taxes.  It also noted that Debtor's accountant did not timely pay

payroll taxes postpetition, resulting in new penalties.  While these facts are true,

the evidence also shows that Debtor is actively seeking to reduce these penalties

through offset of personal tax refunds and negotiations with the IRS.  Given the

reduction in tax owing throughout the past two years, it appears Debtor realized

some success with these efforts.  Debtor's accountant also testified that he

corrected the problem with tardy payroll tax payments and Debtor is complying

with tax requirements.

Union State Bank also contends that Debtor did not issue 1099s to

subcontractors as required by the IRS.  As already discussed, Ottesen testified

that each of these checks was payment for work performed by a corporation or

an LLC, and Union State Bank provided no evidence to the contrary.  Although

25

the lack of formality with record-keeping and check issuance gives the Court
pause, the Court is satisfied that Debtor's conduct with regard to issuing 1099s is
not evidence of a plan proposed in bad faith.

2.    Personal expenses paid with corporate funds

Next, Union State Bank argues that Debtor paid multiple personal
expenses of Joseph and Annemie Ottesen.  The Court previously listed
Ottesen's explanations for these expenses.  During final arguments, Debtor
conceded that some of these expenses should have been handled differently, but
noted that many of them were for business purposes.  It is apparent that Ottesen
assumed that purchasing clothes for work or meals during the work day were
business expenses, but it is also apparent that Ottesen did not investigate the
matter to ensure that it was appropriate to pay these expenses with Debtor's
funds.

While the purchases demonstrate that business funds were used for
personal expenses, the Court finds that this evidence is indicative of a lack of
careful record-keeping and lack of managerial attention to detail, but not
evidence that the Plan was proposed in bad faith.  Debtor did not abuse the
provisions or spirit of the Bankruptcy Code in its Plan; the Plan does not
authorize Debtor to pay personal expenses of the Ottesens, and it is not used as
a tool to misrepresent information or undermine the proposed return to creditors.
If the Plan were confirmed and Debtor continued paying personal expenses of

the Ottesens, then relief to the affected creditors may be warranted.  However, without more, the fact that Debtor may have paid some personal expenses of the Ottesens does not establish that the Plan was proposed in bad faith.

       3.    <u>Not maintaining insurance</u>

Union State Bank argues Debtor has not maintained insurance on its collateral.  The Bank offered Exhibits 123 and 125 in support of this argument, which the Court received.  Ottesen explained that, although Debtor received some notices of cancellation of insurance, no insurance policies actually lapsed. There were a few instances where the insurance payments were not received on time, triggering a notice of cancellation, but Ottesen maintained that the insurance payments were always brought current before any policies lapsed. The Court received no evidence that Debtor's insurance carrier ever terminated any of the policies.  Consequently, this evidence does not establish that Debtor's Plan was proposed in bad faith.

       4.    <u>Use of cash collateral</u>

Union State Bank argues that Debtor's use of the Bank's cash collateral without consent is evidence of bad faith.  As discussed earlier, Debtor admitted to spending approximately $44,000 of Union State Bank's cash collateral in November 2014 without the Bank's consent.  In support of its contention that Debtor's use of its cash collateral demonstrates bad faith under section 1129(a)(3), Union State Bank relies on <u>In re Lafayette Dial, Inc.</u>, in which a court heavily criticized a debtor for using a creditor's cash collateral without consent.

92 B.R. 798 (Bankr. N.D. Ind. 1988).  The court in In re Lafayette Dial did not

conclude that the use of cash collateral was evidence of bad faith under section

1129(a)(3).  Rather, the In re Lafayette Dial court used the use of cash collateral

to justify granting a motion for relief from stay.

A case more closely analogous to this case is In re Barger.  In In re

Barger, debtors sold crops subject to a security interest without notifying a fully-

secured creditor or paying any of the proceeds to the creditor. The bankruptcy

court in In re Barger held that debtors filed their Chapter 12 plan in bad faith and

the Eighth Circuit Bankruptcy Appellate Panel affirmed.  In re Barger, 233 B.R. at

84.  The Bankruptcy Appellate Panel emphasized that the debtors' plan "ignored

the [creditor] altogether and attempted to force the Co-op to protect its rights

outside bankruptcy." Id.  The court concluded:  "It is hardly ever proper, and it is

truly manipulative, to wrongfully and involuntarily convert a creditor's collateral,

reduce the creditor from secured to unsecured status by such conversion, and

then argue that the Bankruptcy Code makes it difficult to confirm a plan that

properly deals with the wronged creditor in relation to the other creditors." Id.

The additional circumstances present in In re Barger that compelled the

court to find an abuse of the Bankruptcy Code are absent here.  There is no

indication that Debtor altered or attempted to alter Union State Bank's secured

status.  Debtor replaced the cash collateral and the Plan treats Union State Bank

as an oversecured creditor.

Although the Court is troubled by Debtor's use of Union State Bank's cash collateral, the Court concludes that, under the facts and circumstances of this case, Debtor's use of the Bank's cash collateral does not establish that Debtor's Plan was proposed in bad faith under section 1129(a)(3).

5.    Withdrawal of cash

Finally, Union State Bank argues that multiple cash withdrawals from Debtor's account demonstrate Debtor's Plan was proposed in bad faith. Ottesen testified that he provided documentation to Union State Bank for all of these cash withdrawals, and the Bank presented no evidence to the contrary. Union State Bank raised questions about whether handwritten receipts from Debtor were sufficient to explain the cash withdrawals. Johnson testified that cash withdrawals are evidence of poor business practices. Although Debtor's business practices need improvement – a fact that Debtor readily admits – Union State Bank fails to articulate how making cash withdrawals and receiving handwritten receipts demonstrates that Debtor did not propose its Plan in good faith under section 1129(a)(3).

As courts in the Eighth Circuit articulated, "the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." In re Reuter, 427 B.R. at 770. In analyzing the factors the Eighth Circuit considered in In re Barger, the Court concludes that Debtor made its best efforts to state its debts and expenses accurately and that Debtor has not made any fraudulent misrepresentations to

mislead the Court.  Although Union State Bank raises many legitimate concerns about Debtor's conduct, those concerns are not sufficient to show Debtor's plan was proposed in bad faith.

The last factor is whether Debtor unfairly manipulated the Bankruptcy Code.  "The proper inquiry is whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code."  Id.  Despite Debtor's informal and arguably sloppy accounting practices and management's inattention to detail, the Court finds no abuse in Debtor's Plan that would justify a finding of bad faith. Thus, the Court concludes that Debtor's Plan was proposed "in good faith and not by any means forbidden by law," satisfying section 1129(a)(3).

## B.    Unfair Discrimination

Union State Bank next argues that Debtor's Plan unfairly discriminates among the class of secured creditors in violation of section 1129(a)(9). Specifically, Union State Bank complains that all other secured creditors' loans are amortized and paid in full over a five-year period, while the Bank's claim is paid over a period of four years with a balloon payment on March 15, 2019. Union State Bank also argues that Debtor's Plan is discriminatory in that it proposes to bring an adversary proceeding to stay enforcement of creditors' claims against the Ottesens personally to which all creditors, except the IRS, would be subject.

"In determining whether or not unfair discrimination exists under a Chapter 11 plan, courts have applied the following four-part test, which requires that: (1) a

reasonable basis for the discrimination exist[s]; (2) the debtor cannot

consummate its plan without discrimination; (3) the discrimination is proposed in

good faith; and (4) the degree of discrimination is directly proportional to its

rationale." In re Am. Trailer & Storage, Inc., 419 B.R. 412, 443 (Bankr. W.D. Mo.

2009). "Unlike unsecured claims, each and every secured claim may be treated

differently. . . . Unlike unsecured claims, every secured claim is different.

Secured claims usually are secured by different collateral and usually have

different priorities even if secured by the same collateral. This fact leads to the

permissibility of individualized treatment based on the particularities of each

secured claim." Id. "If there is a reasonable basis for disparate treatment, there

is no unfair discrimination." Id. In In re American Trailer & Storage, the court

considered the difference in the size of the loans, the type of collateral and

whether it will depreciate faster than other creditors' collateral, as well as whether

the loan terms and interest rates of the loans impair Debtor's ability to

reorganize. Id. at 443–44.

Here, the Court finds that a reasonable basis for the discrimination exists.

Union State Bank filed the largest secured claim. Amortization of the claim

results in the largest monthly payment. Under the Plan, most of the secured

creditors will be paid at an interest rate of three percent, while the Plan provides

that the Bank will be paid the prime rate plus three percent. If the Plan were

confirmed today, Union State Bank would receive interest at the rate of 6.25%.

Because the Bank has such a large claim and it will be paid at an interest rate

more than double the interest rate of the other secured creditors, Debtor demonstrated a reasonable basis for treating Union State Bank's claim differently.

Further, the Court finds that Debtor cannot consummate its Plan without treating Union State Bank's claim differently than the other secured creditors' claims. Given the size of Union State Bank's claim, if Debtor were to amortize the Bank's entire loan over a period of five years, Debtor's Plan payments would be significantly higher. Union State Bank claims the balance due on its loan is $1,460,412.69, which will create a balloon payment obligation of $782,307.98 in August 2019. Debtor argues that Union State Bank's calculations do not take into account all of the money Debtor already paid to the Bank. Debtor argues that the proper loan balance, beginning on August 1, 2015, is $1,347,410, creating a balloon payment obligation of $598,749. Assuming, without deciding, that the loan balance is the lower sum of $1,347,410, amortizing the entire loan over a five-year period at a 6.25% interest rate would increase Debtor's payments to Union State Bank by $8,010.16 every month, and $96,121,92 every year.[2] The Court finds that even at the lower loan balance, Debtor's ability to make Plan payments would be in serious jeopardy were Debtor to amortize the Bank's entire loan over a period of five years. Thus, the Court concludes that

---

[2] A principal loan amount of $1,347,410, amortized over a total of 60 months at a 6.25% interest rate yields a monthly payment of $27,010.16. The difference in monthly payments is the difference between a monthly payment of $27,010.16 and the $19,000 monthly payment required to be paid under the Plan ($27,010.16 - $19,000 = $8,010.16; $8,010.16 x 12 = $96,121.92).

Debtor could not consummate its Plan without treating Union State Bank's loan differently than the loans of the other secured creditors.

The Court also finds that the discrimination is proposed in good faith. As previously stated, Debtor has a reasonable basis for treating Union State Bank differently than the other secured creditors, and the Court received no evidence suggesting bad faith on the part of Debtor in its treatment of the Bank's claim. Additionally, the Court finds that the degree of discrimination is proportional to its rationale.

Union State Bank also argues that the provision in Debtor's Plan, which provides that the Ottesens may bring an adversary proceeding against certain creditors to impose a stay against enforcement of any personal guarantees of debt the Ottesens made, is unfair. In the Plan, Debtors list several creditors in whose favor the Ottesens may have made personal guarantees of Debtor's debt and against whom the Ottesens may seek a stay of enforcement of such personal guarantees. The Plan does not indicate that Debtors will pursue a stay of enforcement against the IRS. Debtors argued that the Ottesens owe a personal obligation to pay the IRS debt, as opposed to merely guarantying Debtor's debt. Union State Bank argues this provision is discriminatory because the "IRS is not subject to the stay of its enforcement of its claim against the Ottesens personally, but the Bank is[.]" Doc. 328, at 7.

The Court rejects Union State Bank's argument. Debtor has a reasonable basis for discrimination because the Ottesens' debt to the IRS, which arose

pursuant to statutes or regulations, is distinct from Debtor's obligation to the IRS.

Further, there is no guarantee that the Ottesens or Debtor will pursue a non-

debtor stay against the Bank or that Debtor will be successful in this endeavor.

Therefore, the discriminatory treatment about which the Bank complains is

speculative.   Accordingly, the Court concludes that Debtor's Plan does not

unfairly discriminate against Union State Bank.

### C.   Feasibility

For the Court to confirm a Chapter 11 plan, section 1129(a)(11) requires

that "[c]onfirmation is not likely to be followed by the liquidation, or the need for

further financial reorganization[.]"  11 U.S.C. § 1129(a)(11).  This section

establishes what is commonly referred to as the "feasibility" requirement.  It

requires the court to determine whether a plan is "workable" before it confirms a

plan.  In re Am. Trailer & Storage, Inc., 419 B.R. 412 (Bankr. W.D. Mo. 2009)

(citing Danny Thomas Props. II Ltd. P'ship v. Beal Bank S.S.B., (In re Danny

Thomas Props. II Ltd. P'ship), F.3d 959, 962 (8th Cir. 1985)).  The purpose of

this section is "'to prevent visionary schemes which promise creditors more under

a proposed plan than that which the debtor can possibly attain after

confirmation.'"  In re Riverbed Leasing LLC, 458 B.R. 520, 530 (Bankr. S.D. Iowa

2011) (quoting In re Crosscreek Apartments, Ltd., 213 B.R. 521, 539 (Bankr.

E.D. Tenn. 1997)).  "'To satisfy the feasibility requirement, [debtors] need to

establish only that the Plan has a reasonable probability of success.'"  In re Am.

Trailer & Storage, Inc., 419 F.R. at 420–21 (quoting In re Apex Oil Co., 118 B.R.

683, 708 (Bankr. E.D. Mo. 1990)).  "Debtor bears the burden of establishing the

feasibility of its plan by a preponderance of the evidence."  Id. (citing Danny

Thomas, 241 F.3d at 963).

> A plan must be workable and offer "a reasonable prospect of success" in
> order to meet the feasibility standard. In re Richards, No. 03–02487, 2004
> WL 764526, at *2–3, 2004 Bankr. LEXIS 388, at *7 (Bankr. N.D. Iowa Apr.
> 2, 2004). "The test is whether the things which are to be done after
> confirmation can be done as a practical matter under the facts." Id. (citing
> In re Clarkson, 767 F.2d 417, 420 (8th Cir.1985)). "The success of a
> debtor's proposed plan need not be guaranteed, but a bankruptcy court
> cannot approve a plan unless there is at least a reasonable likelihood of
> success."  In re Reuter, 427 B.R. at 772. This test is meant to prevent
> confirmation of plans based upon speculation.  Financial uncertainty is not
> a bar to confirmation, but there must be a practical showing that post-
> confirmation obligations can be met.  "While a reviewing court must
> examine 'the totality of the circumstances' in order to determine whether
> the plan fulfills the requirements of § 1129(a)(11), only a relatively low
> threshold of proof is necessary to satisfy the feasibility requirement." In re
> Sagewood Manor Assocs. Ltd. P'ship., 223 B.R. 756, 762 (Bankr. D. Nev.
> 1998) (citations omitted).

In re Riverbend Leasing LLC, 458 B.R. at 531–32.

"To determine whether a plan is feasible, the court should analyze the

debtor's projected income and expenses in relation to actual past performance."

In re Am. Trailer & Storage, 419 B.R. at 423.  "Other factors courts have

considered when making this determination include the experience and ability of

management, the adequacy of capital resources, and reasonably anticipated

liquidity.'"  Id. (citing Apex Oil, 118 B.R. at 708 (citing United Props., Inc. v.

Emporium Dep't Stores, Inc., 379 F.2d at 68–70; In re Toy & Sports Warehouse,

Inc., 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984))).

    1.   Projections

Union State Bank asserts Debtor cannot show that it can meet its

projections based on its past performance.  The Bank emphasizes that Debtor

failed to meet its 2014 projections and there is no basis to conclude that it will

meet its 2015 and 2016 projections.  The Bank also argues Debtor does not have

sufficient cash to make the Plan payments.

Debtor projected gross revenue of $2,389,419 for 2014, but its actual

gross revenue was over a million dollars less than this figure.  It estimated

operating cash flow of $721,982.29 for 2014, but its cash flow was only

$193,674, which is insufficient to make all Plan payments, particularly when

$149,857.03 of this income was derived from prepetiton accounts receivable

which serves as security for debt to Union State Bank.

Debtor offered no historical data to support the proposition that it would

realize a net income of $478,224 in 2015 or $538,855 in 2016.  Likewise, it

offered no evidence that it would achieve gross receipts of $3,760,000 in 2015

and 2016.  The gross receipt figure is three times the figure it earned in 2014,

and more than $1 million more than the gross revenue it earned in any one year

since it began business, except 2011.  The only historical data the Court received

as evidence was one page from a 2014 tax return, Drovdal's testimony that

Debtor recorded a loss in 2012 and 2013 tax returns, and operating reports that

show Debtor realized a tax loss of $182,159.  If depreciation is not considered,

Debtor realized a profit of only $193,674 in 2014 (or $43,817.64 if prepetition

accounts receivable are deducted).

The figures from Debtor's monthly reports show that Debtor did not collect

sufficient receipts to pay its debts 7 out of 15 months.  Although it is not entirely

clear what Debtor's monthly Plan payments will be because this figure was not

provided, it appears that Debtor would have to pay almost $21,000 on the

effective date of the Plan, and monthly payments under the Plan of more than

$26,000.  These numbers do not take into account attorney fees of at least

$120,000, accounting fees of at least $17,500, trustee fees and any payment to

Joseph Ottesen.  Further, Debtor would also have to pay a minimum of $50,000

to the unsecured creditors each year.  Based on these figures, Debtor would not

have had sufficient income to make Plan payments in 10 out of 15 months if the

Court looks at each month, standing alone.  If the Court looks at a running

balance, Debtor would not have had sufficient income to make Plan payments in

6 out of 15 months.

When the Court considers the income Debtor earned but has not yet

collected, Debtor's financial status appears better.  Unfortunately, Debtor's

prepetition and postpetition history illustrate its long-standing difficulty collecting

its accounts receivable.  Debtor's problem collecting from Oil & Gas Transfer is

symptomatic of this ongoing collection issue, and it is a major component of

Debtor's cash flow problem.  As of April 30, 2015, Debtor had only collected

$310,377 of the more than $2.1 million owed it on prepetition accounts receivable.  Likewise, more than $800,000 of its outstanding postpetition accounts receivable (which total $1,171,278) are more than 60 days old.

Union State Bank also challenges the reliability of particular expense figures Debtor used to project income for 2015 and 2016. As noted above, the Bank's objections are not persuasive, but Debtor's expense figures are unquestionably imprecise.

Other than Ottesen's testimony that he continues to work hard to obtain business, that companies who work in the oil fields can rely on his timely response and that he expects demand for the services that he offers will continue due to "surge funding" from the State of North Dakota, Debtor offered no evidence that it would continue to receive work and show profitability sufficient to pay the payments under the Plan.  Debtor offered no business plan, no expert testimony, no contracts showing guaranteed work in 2016 or after and no job cost system to show that the contracts Debtor is completing are profitable.  Even the work Debtor expects to receive in the next few months is uncertain.  Debtor's bids have been accepted by several North Dakota counties and cities, but none of the work the counties anticipated they might need has resulted in actual purchase orders yet.  Ottesen assumes it will continue to do business with NextEra and Heartland Grading, but Debtor offered no evidence of contracts or long-term commitments from these customers.  Debtor has filed a lawsuit against the postpetition customer who owes it the most money and filed a mechanics lien

38

against the pipeline owned by Enable, who Debtor anticipated might provide

more work in the future.  Although Debtor expressed optimism, it is apparent that

Debtor's business relationship with both companies remains uncertain.

In summary, there is simply not enough evidence to show that Debtor will

be able to meet its obligations under the Plan.

2.    <u>Balloon payment</u>

The Plan provides that Debtor will make payments to Union State Bank

over four years with a balloon payment in August 2019.  In addition to arguing

that this treatment is not fair and equitable (which the Court already discussed),

Union State Bank also makes an argument rooted in feasibility.  Specifically, it

asserts Debtor has not shown any ability to make this payment or described the

source of the funds for the balloon payment.

> "The inclusion of a balloon payment is not dispositive of a plan's feasibility."
> <u>First Nat'l Bank of Boston v. Fantasia</u> (<u>In re Fantasia</u>), 211 B.R. 420, 423
> (B.A.P. 1st Cir. 1997). "Confirmation of a plan is suspect, however, unless
> some proof is offered to show that the funds will be available at the time
> the balloon payment is due." <u>Id.</u>, quoting <u>In re Gregory</u> 143 B.R. 424, 426
> (Bankr. E.D. Tex. 1992). To determine feasibility of a plan in which a
> balloon payment on a secured debt is proposed, courts look to a number of
> factors. The factors include the future earning capacity and disposable
> income of the debtor, whether the plan provides for payment of interest to
> secured creditors, the debtor's perseverance and motivation to execute the
> plan successfully, the type of employment in which the debtor is engaged
> or may become engaged, whether the plan includes a cushion for
> unexpected expenses, the equity in the property, whether the plan
> provides for recurring charges against the property, and whether the plan
> provides for payments to the creditor which will significantly reduce the

debt and enhance the prospects for refinancing at the end of the plan. In re Wagner, 259 B.R. 694, 701 (B.A.P. 8th Cir. 2001).

In re Am. Trailer & Storage, Inc., 419 B.R. at 430.  In In re American Trailer & Storage, the court found the plan feasible because the debtor had a substantial equity cushion, its projections regarding its future earning capacity were reasonable and historically based, the evidence supported that the debtor's earnings were likely to increase, the debtor was motivated to make the reorganization successful, the debtor was respected in the industry despite the bankruptcy, and the debtor was making payments to the objecting secured creditor and was current on all postpetition expenses.  Id. at 430–31.

The only issue in In re American Trailer & Storage was whether the debtor would be able to obtain a loan to refinance approximately 55% of its remaining debt owed to the secured creditor at the end of the reorganization.  Id. at 431. The court found that the debt reduction during the life of the plan made the debtor's chances at refinancing the balloon payment positive.  It also found that the collateral was unlikely to decline significantly in value during the reorganization.  The court therefore found that the debtor "met its burden of establishing with reasonable certainty that it [would] be able to obtain funds to refinance the balloon payment.  Id.

As a threshold matter, Debtor did not offer any evidence that funds would be available at the time the balloon payment is due which renders confirmation "suspect."  In re Am. Trailer & Storage, Inc., 419 B.R. at 430 (citation omitted).

40

Ottesen testified that he planned to either use profits to make the balloon payment or to refinance, but he did not explain how either would happen.

In considering the factors outlined in <u>In re American Trailer & Storage</u>, the Court finds that the Plan provides for the payment of interest to Union State Bank, and Ottesen's perseverance and motivation to execute the Plan successfully weigh in Debtor's favor.  Other factors weigh against Debtor. While the Plan provides for payments to the Bank that will significantly reduce the debt, the remaining debt will still be more than $500,000.  As already discussed, Debtor's future earning capacity and disposable income are speculative.  Debtor failed to even offer projections beyond 2016.  The nature of Debtor's work has evolved over the last few years, making even the type of work Debtor will perform uncertain. The Plan does not include a cushion for unexpected expenses and no funds are set aside for maintenance or replacement of its equipment, which continues to depreciate.  Lastly, Debtor's lack of equity in the property weighs against the feasibility of the balloon payment and the Plan in general.  Given Debtor's relationship with the Bank, there appear to be no prospects for refinancing.  All of these factors related to the balloon payment, when considered together, weigh against feasibility.

In addition to the issues with the balloon payment, the lack of reliable projections – and, again, the absence of any projections beyond 2016 – lead the Court to conclude that Debtor's Plan is not feasible. "To establish feasibility, the debtor must present proof through reasonable projections, which are not

41

speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." In re Quigley Co., Inc., 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (quoting In re Leslie Fay Companies, Inc., 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997)).

The Plan is not workable and does not offer a reasonable prospect of success. Debtor did not show that the Plan meets the requirements of section 1129(a)(11). Union State Bank's objection to confirmation based on feasibility is SUSTAINED. Confirmation of Debtor's Modified (May 19, 2015) Amended Plan of Reorganization (#4) is DENIED.

The Court considered all other arguments and deems them to be without merit.

**SO ORDERED.**

Dated this 12 day of June, 2015.

Shon Hastings, Judge
United States Bankruptcy Court